Welcome to the Fourth Circuit and we'll hear argument in our first case, Canales-Rivera v. Barr. Mr. Douglas. Good morning to the court. May it please the court, my name is Richard Douglas and I represent the petitioner Noel Canales. I also represented him in immigration court and at the Board of Immigration Appeals. This case involves agency denial of the asylum claim of a persecuted merchant under the particular social group ground. At a minimum, we think the board should have applied its own asylum eligibility test to this merchant instead of excluding him from coverage because of his merchant status. In 1985, the board crafted a test and a decision called matter of Acosta dealing with social group asylum claims. Did you raise Acosta below? Yes, we did, Judge Thacker, from the very beginning. Under the test, the adjudicator must decide whether a social group characteristic formulated by a person seeking protection is fundamental enough to the victim's identity or conscience to warrant protection. Instead of applying the case-by-case approach which the board actually included in Acosta or recommended in Acosta, with no authority in our view, the board created what has become a formulaic rule, namely, an across-the-board exclusion of merchants from social group asylum protections. Mr. Canales was a merchant in Honduras whose small restaurant had a fixed location, completely visible and registered with the authorities. He was persecuted on account of his membership in the social group that we thoroughly explained. So what do you want us to do with Acosta? What I think you should do with Acosta, Judge Thacker, is extremely narrow. I think Acosta must no longer stand for the proposition that merchants can simply be excluded in a formulaic per se way from asylum protections. We're not asking the court to demolish Acosta. We're asking the court to simply make the board and the agency apply its own test to merchants without this sort of exclusion at the threshold. You say BIA's interpretation is unreasonable and not entitled to deference based on Hobby Lobby, Masterpiece Cake Shop, Arlene's Flowers, etc. But I don't think that argument ever appeared in your notice of appeal or your briefs before the Board of Immigration Appeals. Judge, we did make the argument that the merchant exclusion in Acosta was not supported. And that's what I was getting at earlier when I asked you whether Acosta was raised below. Yes, it was. Was this argument raised below? Yes, it was, Judge Thacker. Can we find that? It was in our pre-hearing brief. So your position is that by saying the merchant exception or the merchant aspect of the decision in Acosta was raised, that that raises your Hobby Lobby, Masterpiece Cake Shop argument? Well, first, Judge Qualivam, what we're saying is we made the argument from the beginning. You made the argument about the merchant maybe from the beginning. Correct. I think our question here is how do you get from that argument that you've preserved this argument about Hobby Lobby and Masterpiece Cake Shop? When we came to file our petition with this court, it's true that we did not raise these three Supreme Court precedents below. And I'm referring to three, actually. It's Brownfield v. Brown, Hobby Lobby, and Masterpiece Cake Shop. The purpose in raising them really was to, as the court wrote in Ramirez v. Sessions, sharpen, bolster, and support our argument. But the basic argument itself hasn't changed from the very beginning. We've argued that Acosta was – or the board did not have the authority in Acosta to do what it did on merchants. We went through the list of what we think were the most important sources of the board's authority on this kind of thing. For example – Well, what does it mean in your brief before the immigration court? On the second page, you say the particular social group satisfies Acosta's case-by-case approach. And Acosta, the board itself, said that the best approach – and I'm paraphrasing now – the best approach to these kinds of social group cases is a case-by-case approach. Because one of the difficult things about it is that there's no – for years, there was a struggle in trying to identify a way to deal with these cases because there are so many differences. And the way the court – or the way the board came down in its decision was to incorporate this concept of the edgesome, generous, things that are alike. And that's sort of the heart of the Acosta decision. So are you saying that that principle is incorrect? No, I'm not. As a matter of fact, on the whole, we think that the Acosta case would certainly survive our argument. The part that we are asking this court essentially to take out of that test or take out of the Acosta analysis is what we see as a per se, formulaic exclusion of merchants. In most cases at the threshold, often this exclusion is applied before fact-finding, before any sort of analysis is done at all. There's a lot more than Acosta. I mean, the board cited cases from our court regarding restaurant owners, from the Fifth Circuit regarding government employees, from the Seventh Circuit regarding business owners. And it seems to be based on the notion that the mutable requirement just isn't met by something where someone voluntarily selects a particular type of business. And so, yeah, I'm trying to understand your argument there. It seems like a great number of cases from not just the board but across various circuits that the type of social group you're talking about just doesn't meet the mutable requirements that is required. Judge Cautabon, it's true that in 35 years there have been quite a few opinions, not only from the board but in the courts, and, of course, the Fourth Circuit's among them. We've also found many other opinions in the other circuits. For example, the most recent that we're aware of were just filed on Sunday night by the government and supplemental authorities, a Second Circuit case, a Sixth Circuit case. The BIA order in our own case cited several cases, Arevalo v. INS in this circuit, Nadman v. Holder, which was the Seventh Circuit, and Bermudez, Fifth Circuit. But all these cases lead to the same place, and that is Acosta. All of these cases cite Acosta as authority for the proposition that being a merchant is not so fundamental, which is the exact language of the decision, not so fundamental to identity or conscience to warrant protections. So what was your client doing that was a mutable characteristic? He was a merchant in the formal Honduran economy, Judge Agee. And what we mean by that is he took steps to… He was selling chickens out of his store, right? He was a small restaurant owner, and, yes, he was roasting chickens in his store. So help me understand how selling roasted chickens isn't a mutable characteristic. Well, Your Honor, we think that it's really not about the chickens. It's about self-determination. It's about self-sufficiency. It's about… It's not about chickens. It's not about cakes. Well, isn't everyone interested in self-sufficiency? How is this a unique characteristic? I agree that everyone's interested, Judge Thacker, but not everyone is persecuted. And the message from Acosta is if you're persecuted, you can change jobs. And that's essentially the same message. Well, how would he be different from any other merchant in the Honduran economy? Well, I think the way we would find out is to do fact-finding, to do some oral argument, and to take some testimony about specifically that issue. But what about what he's doing is different from anyone else in the economy? I mean, it can't be the fact that he was persecuted. You have to attribute the persecution to something immutable to him. In our pre-hearing brief, Judge Qualabong, we at length described or provided the answer to this question. We made a distinction in our formulation of the particular social group between the formal economy and the informal economy. This is a recognized distinction in development. OECD and the World Bank recognize it. We provided their definitions. We explained why it's different. It's the difference between somebody who perhaps might be selling something from a basket on the street and somebody who, as in Mr. Canales' case, has – whether they're in the formal economy or the informal economy. I mean, how – and then we've asked this question several ways. I'm having trouble how seeing your client is any different than anybody else in the Honduran economy. It seems like under your argument, we would just basically depopulate Honduras and bring everybody to the United States that's in business. Well, actually, Judge Agee, we made a very clear distinction in keeping with the requirements of ACOSTA, as it's been interpreted over the years on things like social visibility, particularity, and so forth. It is possible to distinguish the formal economy from the informal economy by things like having a fixed location, being registered with the government, paying taxes, having licenses, and so forth. Mr. Canales did all of those things, and all of those things were explained in our pre-hearing brief, and they're in the record. According to sources that we've also cited in the pre-hearing brief, the formal economy in Honduras can be extrapolated to only about 20 percent of the entire economy, and we feel that that's precisely the kind of visibility or particularity that the board asked for in cases after ACOSTA on precisely this issue. But the problem here is we don't even get to that analysis because of this at-the-threshold removal of merchants from protections, and that's really the result of ACOSTA. All the cases we've talked about, if you look at them and how they use ACOSTA, they all essentially treat it the same way, which is in ACOSTA, the board said, not so fundamental to identity or conscience that warrant protections, and that's the end of the analysis. In a few, and in this case, the Fourth Circuit did some analysis, but frankly, not much, and in our case, very little was done. And we see this as, A, unsupported by the Immigration and Nationality Act. I mean, there's certainly no authority in the act for this, certainly unsupported by the convention, and our argument to this court is that narrow exclusion should no longer occur. Now, we do think the court has the jurisdiction to review this case. We believe that under the 1252 analysis, which requires the court to defer to fact-finding, in this case, we really don't have any fact-finding. The board itself didn't conduct any fact-finding, and the immigration court below, the immigration court referred to a particular social group that the court supplied, not ours. In fact, if you look at the oral testimony, our particular social group formulation is not even mentioned. Didn't the immigration judge do a factual evidentiary-based analysis on the issue of whether the government would acquiesce or be of contributing to any persecution? Judge Quadovong, in our judgment, in our point of view, the entire oral decision is seen through the prism of the judge's own particular social group formulation, which I would call the more common game approach to a case like this. But he listed the testimony of your client. He listed the testimony of Ambassador Noriega. He listed the testimony of the expert on why someone would not stop in some of the intervening countries. He listed the testimony of the psychologist, and he basically concluded that that didn't meet the burden of proof that was imposed, and we have certain obligations to defer to that type of analysis, don't we? Well, my concern here, Judge, was that the court's analysis, which is in the transcript, as I said earlier, was seen through the prism of a different social group formulation, and I believe it might have come out differently if the judge had seen the evidence through the formulation that we provided, and that didn't happen, unfortunately. Back to the point of the court's jurisdiction to hear this case, we think that there are a number of things that the court ought to take into consideration on this issue, namely that there was no authority, in our view, for ACOSTA to do what it did specifically on merchant victims, and our research has disclosed no other category or no other classification where this sort of exclusion happens. Second, we think that in this case, the adjudicator effectively didn't follow the adjudicator's own rules. I mean, we made a point in our BIA brief or in our board brief that the immigration judge manual, I mean, it's not a perfect source, but it wasn't followed. I mean, we're not allowed to do basic things that might have helped us understand the case better, and we also think that if the court doesn't hear this case or concedes the government's position, then there are a number of things that the court would have to, in a sense, overlook, and primarily the lack of authority in ACOSTA for this kind of exclusion, the lack of serious fact-finding, in our view, anyway, the lack of analysis at the board beyond the ACOSTA exclusion, and we don't think that's any reason why 1252 should be invoked, much less observed in this case. With that, I will end, and I'd like to reserve any remaining time for rebuttal if the court has no further questions. All right, thank you very much. Thank you. We have some rebuttal time. Mr. Nsinga. Yes, sir. So why don't you start by telling us what exactly you think is before the court in this case? Yes, Your Honor. Good morning. Andrew Nsinga, of course, on behalf of the Attorney General. What's before this court at this point is a procedural due process. This is a procedural due process. Petitioner has abandoned essentially every claim he presented to the agency, and the only claim he really argues in his brief has not really been discussed today, which is how does the Supreme Court precedence in religious cases modify ACOSTA? And no matter how Petitioner parses it, he asks for modification. ACOSTA is wrong. Well, why? Because the Supreme Court has somehow said it is in Supreme Court decisions that have no application here. He didn't present that argument to the agency. Perhaps ACOSTA violates tax law. Perhaps ACOSTA violates a criminal statute. Maybe ACOSTA violates some U.N. handbook from 1947. I don't know. And the agency doesn't know because the argument wasn't presented to it. So what do we have before essentially just a procedural due process claim that the immigration judge inaccurately described a particular social group to find? And it's accurate to say the immigration judge looked at the wrong particular social group. The immigration judge looked at the particular social group that was provided in the asylum application, and then the pre-hearing brief, it was modified to the current one. The board looked at the particular social group and said, well, under ACOSTA, what do we have to have? An immutable trait. But they looked at the correct social group. Yes, sir. They looked at merchants in the formal Honduran economy. And that's the one they looked at. And in Petitioner's opening brief essentially concedes that it was allowed to look at this interpretation. In fact, it actually argues the agency can do fact-finding, which of course is more complicated under the current regulations. But the agency simply looked at ACOSTA and said, well, under ACOSTA, immutable trait, and generally job does not meet that definition. That's really the entire case the court actually has before it. Unless your honors have any further questions, then I'll submit. All right. Thank you very much. Thank you, Your Honor. Mr. Douglas, you've got a few minutes left. Thanks, Judge Agee. Yes, we do want a modification to ACOSTA's long history, but we don't want to dismantle it. What we want is for the board to stop singling out merchant claims for almost refusal at the front door. We don't think the board has the authority to do that. And with or without the Supreme Court opinions, we don't think that the long history of this way of interpreting the Immigration and Nationality Act is correct. We think there's no authority in it. Now, as far as the particular social group, yes, in fact, the form I-589, which we filed for Mr. ACOSTA under great time pressure before we had an opportunity to try to investigate and get information from Honduras and so forth, did have a different formulation, but it wasn't the formulation the judge used. I mean, if you look at the record, you'll see it was slightly different. But either way, when we went to our master calendar hearing and when we actually filed the I-589, same judge, we made very clear we intended to edit and supplement, and we did edit and supplement, and the same judge held the merits hearing. So there was no question about this claim. It's the same claim we made in immigration court, and it's the same claim we're making today. And our view is that with or without the Supreme Court authority, the narrow change that we're requesting for ACOSTA in this case is possible and necessary. We would also request that the court remand this case to the board for oral argument on the fundamentality of his particular social group, that is, Honduran merchants in the formal economy, to him, to his identity and conscience, and that henceforth the board also order, or that this court also order that the board no longer apply this unauthorized, per se exclusion of merchants from the ACOSTA test. We believe there are models out there that the court could use for this sort of analysis, and one of the models that we've seen was the conscientious objector statute that is very clearly authorized by Congress with a very detailed instruction about its application. We think that while the court may not necessarily want to order the board to do something like this, it's certainly worth recommending to the board that they look for a more concrete way of adjudicating this claim, because what we have now is a particular social group term with no definition at all. There's no definition in the convention. There's no definition in the Immigration and Nationality Act. We also have a term that the board coined, which is fundamentality to identity or conscience of an applicant. Also, there's no definition for this term, and over 35 years about the only way you can sort of extract a definition is by seeing the kinds of cases that the board has approved. But what we believe that it's correct to tell the court, overall, nowhere in the sources, nowhere in the authorities, is there authority for the board to exclude merchants from protections. It just doesn't exist. So what do we do about the 35 years? I think under the Kaiser versus Woelke analysis, Judge Gorsuch said, you know, we're not bound inexorably by the rules of stare decisis, but we can certainly look at developments, since a particular principle was enunciated, to see how developments affect the principle. And this is essentially what we're asking the court to do. We certainly think it would not be advisable to not take into account Supreme Court authority that's binding on the branches, one of which was in force when the board wrote its appendix. Thank you for the opportunity to address you. Nothing further. There are no questions. Thank you very much. We will come down and greet counsel and move on to our next case.
judges: G. Steven Agee, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.